UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ABRAHAM CUCUTA,                                    :

                         Plaintiff,               :            13 Civ. 558 (AJP)

           -against-                              :            **OPINION & ORDER**

NEW YORK CITY, DETECTIVE ERICK ORTIZ,   :
DETECTIVE ABEL JOSEPH, DETECTIVE
CARPENTER, DETECTIVE LIAM                  :
MCLAUGHLIN, SERGEANT NEFTALI
BETANCES, LIEUTENANT ANTHONY RONDA, :
CAPTAIN KEVIN RADDAY, OFFICER
WINSTON FAVIS, OFFICER AGUASANTE,        :
JOHN DOES 1-5,
                                                   :
                         Defendants.
                                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

                Pro se plaintiff Abraham Cucuta brings this action pursuant to 42 U.S.C. § 1983

against the City of New York, Detective Erick Ortiz, Detective Abel Joseph, Detective Keith

Carpenter, Detective Liam McLaughlin, Lieutenant Neftali Betances, Lieutenant Anthony Ronda,

Captain Kevin Radday, and Police Officer Winston Favis (collectively "defendants").[1]  Cucuta's

second amended complaint, liberally construed, alleges violations of his Fourth Amendment right

against unreasonable search and seizure, Fifth and Fourteenth Amendment rights to due process, and

Fourteenth Amendment right to equal protection.  (Dkt. No. 22: 2d Am. Compl. ¶ 2(B).)  Cucuta's

claims arise out of the New York Police Department's ("NYPD"): (1) entry into and seizure of

Cucuta's girlfriend's apartment prior to obtaining a search warrant; (2) alleged search of the

---

[1]     Det. Liam McLaughlin, Officer Aguasante, and John Does 1-5 have yet to be served with
a summons and complaint.  The claims against them are dismissed for the reasons set forth
in this Opinion as to the other defendants.

2

apartment prior to obtaining a warrant; and (3) pinging of Cucuta's cell phone.  (2d Am. Compl. ¶¶ 3(C)(5)-(20).)  Cucuta seeks $1,000,000 in damages.  (2d Am. Compl. ¶ 5.)

    Presently before the Court is defendants' summary judgment motion.  (Dkt. No. 70: Defs. Notice of Motion.)  The parties have consented to the decision of this motion by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 74.)

    For the reasons set forth below, defendants' motion is <u>GRANTED</u>.

<strong><u>FACTS</u></strong>

    The evidence in the summary judgment record, construed in the light most favorable to Cucuta as the nonmoving party, is as follows:

<u>**Background**</u>

    On April 12, 2011, a Southern District of New York grand jury indicted Cucuta for conspiracy to distribute crack cocaine, and the Court issued a warrant for Cucuta's arrest.  (Dkt. No. 72: Defs. Rule 56.1 Stmt. ¶¶ 1-3; <u>see also</u> Dkt. No. 71: Cooper Aff. Ex. E: Cucuta Indictment; Ex. F: Cucuta Arrest Warrant.)[2]  At approximately 11 a.m. on April 13, 2011, NYPD Detective Liam McLaughlin stationed himself outside Cucuta's girlfriend Tamika Taylor's apartment building at 1952 Second Avenue in Manhattan.  (Defs. Rule 56.1 Stmt. ¶¶ 5, 18.)  The NYPD had ascertained this location by "pinging" Cucuta's cell phone multiple times.  (Defs. Rule 56.1 Stmt. ¶ 13; Ex. I: Suppression Hearing ("Supp. H.") Tr. at 70.)[3]  When Det. McLaughlin observed Cucuta exit 1952 Second Avenue, he radioed Cucuta's location to Captain Kevin Radday and Lieutenant Anthony

---

[2]  Unless otherwise noted, references to "Exs." are to the Exhibits attached to the Cooper Affidavit, Dkt. No. 71.

[3]  Pinging "consists of the cell phone carrier surreptitiously accessing by satellite the cell phone's GPS location, or if unavailable, its location in terms of its proximity to the nearest cell phone tower."  <u>United States</u> v. <u>Caraballo</u>, 963 F. Supp. 2d 341, 346 (D. Vt. 2013).

Ronda.  (Defs. Rule 56.1 Stmt. ¶¶ 6, 8.)  Capt. Radday and Lt. Ronda arrested Cucuta on East 102nd

Street between Second and Third Avenues and transported him to an arrest processing site in the

25th Precinct.  (Defs. Rule 56.1 Stmt. ¶ 9; Ex. D: Cucuta Dep. at 26.)  Detective Erick Ortiz

interviewed Cucuta after his arrest.  (Defs. Rule 56.1 Stmt. ¶ 10; Cucuta Dep. at 39.)  Cucuta

provided his mother's address, 402 East 105th Street, and his parole address, 1952 First Avenue, as

his addresses.  (Defs. Rule 56.1 Stmt. ¶ 11; Cucuta Dep. at 20, 34.)  Cucuta admitted during Det.

Ortiz's interview that video evidence would show that he had just come from 1952 Second Avenue.

(Defs. Rule 56.1 Stmt. ¶ 14; Cucuta Dep. at 36.)  Despite admitting this at his deposition, Cucuta

now denies that he gave this information to the police.  (Dkt. No. 78: Cucuta Opp. Br. at 3.)

**1952 Second Avenue, Apt. 301**

Tamika Taylor, Cucuta's girlfriend, resided in Apt. 301 with her son Syncere, her

mother Christine Alonzo, and her brother Andre Montgomery.  (Dkt. No. 72: Defs. Rule 56.1 Stmt.

¶¶ 18-20; Ex. C: Taylor Dep. at 15.)  Cucuta's name was not on the lease, but he stayed in Apt. 301

on weekends and occasionally during the week.  (Defs. Rule 56.1 Stmt. ¶¶ 22-23; Taylor Dep. at 15-

17.)  Cucuta did not have a key and did not contribute to the rent, but kept clothes and sneakers in

a closet he shared with Taylor.  (Defs. Rule 56.1 Stmt. ¶ 22; Taylor Dep. at 15-17.)  When Cucuta

stayed the night, he exclusively stayed in the master bedroom with Taylor.  (Defs. Rule 56.1 Stmt.

¶ 23; Taylor Dep. at 26.)

Capt. Radday and Lt. Ronda entered 1952 Second Avenue to ascertain in which

apartment Cucuta had been.  (Defs. Rule 56.1 Stmt. ¶¶ 12-15; Ex. I: Supp. H. Tr. at 70-71.)  Based

on Cucuta's statement, Det. Ortiz informed Capt. Radday and Lt. Ronda that Cucuta had come from

Apt. 301.  (See Defs. Rule 56.1 Stmt. ¶ 16; Supp. H. Tr. at 71.)  Capt. Radday and Lt. Ronda

knocked on the door of Apt. 301 around noon.  (Defs. Rule 56.1 Stmt. ¶ 16; Taylor Dep. at 30.)

Capt. Radday and Lt. Ronda identified themselves as the police, stated that they had just arrested Cucuta, and were there to return his belongings.  (Defs. Rule 56.1 Stmt. ¶¶ 17, 20; Taylor Dep. at 31.)[4]  Taylor opened the door and Capt. Radday and Lt. Ronda entered into the apartment's living room.  (Defs. Rule 56.1 Stmt. ¶ 25; Taylor Dep. at 33, 41; Supp. H. Tr. at 100-01.)[5]  Capt. Radday and Lt. Ronda announced that they had reason to believe Cucuta kept a gun there and that the apartment was being frozen until they obtained a search warrant.  (Defs. Rule 56.1 Stmt. ¶¶ 26-27; Taylor Dep. at 33, 41.)  Capt. Radday remained in the living room while Lt. Ronda stepped towards the doorway of the apartment and placed a call to get a search warrant.  (Defs. Rule 56.1 Stmt. ¶ 28; Supp. H. Tr. at 102.)  Capt. Radday escorted Taylor, Montgomery and Sincere into the hallway while the apartment was frozen.  (Defs. Rule 56.1 Stmt. ¶ 29; Taylor Dep. at 60.)  The officers asked whether anyone else was in the apartment and Taylor said no.  (Taylor Dep. at 65.)  However, Taylor later admitted to the officers that Adam Hogan, a friend, was still in the apartment.  (Defs. Rule 56.1 Stmt. ¶ 31; Taylor Dep. at 65.)  Hogan was found in a bedroom hiding under the covers. (Defs. Rule 56.1 Stmt. ¶ 32; Taylor Dep. at 65.)  Still in the hallway, Taylor also told an officer that there was a gun in a closet in the master bedroom.  (Defs. Rule 56.1 Stmt. ¶¶ 31, 33; Taylor Dep. at 61-63, 68.)  Lt. Ronda brought Taylor back into the apartment so Taylor could show him exactly where the gun was located.  (Defs. Rule 56.1 Stmt. ¶ 33; Taylor Dep. at 63, 68-69.)  The police stated that they were not allowed to go into the closet and asked for Taylor's permission to search,

---

[4]   A few days before, Capt. Radday had encountered Taylor with Cucuta on the street; Cucuta identified her by her first name and as his girlfriend.  (Defs. Rule 56.1 Stmt. ¶ 21; Ex. D: Cucuta Dep. at 39.)

[5]   It is not clear whether Capt. Radday and Lt. Ronda asked to enter or Taylor invited them in, but in any event, it is undisputed that Taylor opened the door knowing it was the police and did not protest their entry into her apartment.  (Compare Supp. H. Tr. at 100-01, with Dkt. No. 78: Cucuta Opp. Br. at 4-5.)

but did not receive it.  (Taylor Dep. at 64-65.)  Taylor was brought back out into the hallway outside the apartment.  (Defs. Rule 56.1 Stmt. ¶ 33; Taylor Dep. at 65.)

At approximately 5:11 p.m., the police secured a search warrant for Apt. 301.  (Defs. Rule 56.1 Stmt. ¶ 37; see also Ex. H: Search Warrant at 1.)  Officer Winston Favis of the Evidence Collection Team recovered the gun from the closet identified by Taylor.  (Defs. Rule 56.1 Stmt. ¶ 38.)[6]  The police also recovered seventy-six ziplock bags of crack cocaine belonging to Cucuta.  (Defs. Rule 56.1 Stmt. ¶¶ 39-40; Cucuta Dep. at 63, 82.)

Cucuta was not present during the freeze and search of Apt. 301.  (Defs. Rule 56.1 Stmt. ¶ 40; Cucuta Dep. at 63.)

**Cucuta's Conviction**

On October 9, 2012, Cucuta pled guilty to conspiracy to distribute crack cocaine.  (Ex. M: Plea Tr. at 30.)  Cucuta stated at his plea allocution that "between December 2010 and April 2011" he "agreed with at least one other person to possess and distribute more than 28 grams of crack cocaine" and that he was aware that what he was doing was wrong and illegal.  (Plea Tr. at 29-30.)

**Cucuta's § 1983 Claims**

On January 23, 2013, Cucuta sued the NYPD, Detective Erick Ortiz, Detective Abel Joseph, Detective Keith Carpenter, Lieutenant Neftali Betances, Lieutenant Anthony Ronda, and Officer Winston Favis alleging "illegal search and seizure."  (Dkt. No. 2: Compl. at 5.)  Chief Judge Preska ordered Cucuta to file an amended complaint "containing facts that show why each named defendant should be held liable for what occurred."  (Dkt. No. 7: 4/10/13 Order at 3.)  The Order

---

[6]     It is unclear whether Officer Favis was present in Apt. 301 prior to issuance of the search warrant.

6

also dismissed Cucuta's claims against the NYPD "because a New York City agency is not an entity

that can be sued." (4/10/13 Order at 3.) Cucuta filed his second amended complaint on October 22,

2013, adding Capt. Kevin Radday as a defendant. (Dkt. No. 22: 2d Am. Compl.) The following

summarizes the asserted claims and the factual evidence against the various defendants:

### Capt. Kevin Raddy and Lt. Ronda

Cucuta's amended complaint asserts Fourth Amendment violations by Capt. Radday

and Lt. Ronda for their seizure of Apt. 301 and alleged search prior to securing a warrant. (Dkt. No.

22: 2d Am. Compl. § III.C, ¶¶ 5-16.) The amended complaint also alleges a Fourth Amendment

violation for the pinging of Cucuta's cell phone. (2d Am. Compl. § III.C, ¶ 5; see also Dkt. No. 78:

Cucuta Opp Br. at 7.)[7]

### Det. Erick Ortiz

Detective Ortiz processed Cucuta at the 25th precinct after his arrest. Det. Ortiz

questioned Cucuta about his whereabouts the night before. Det. Ortiz later joined Capt. Radday and

Lt. Ronda at Apt. 301. (See pages 3-4 above; see also Ex. D: Cucuta Dep. at 127.) It appears that

Cucuta attributes to Det. Ortiz the same Fourth Amendment violations ascribed to Capt. Radday and

Lt. Ronda. (Dkt. No. 22: 2d Am. Compl. § III.C, ¶ 5.)

### Lt. Neftali Betances

Cucuta testified at his deposition that Lt. Betances is "basically like the commanding

officer. So he has authority over [the other officers involved] and should have stopped them as far

as entering that apartment . . . ." (Ex. D: Cucuta Dep. at 129; Dkt. No. 72: Defs. Rule 56.1 Stmt. ¶

---

[7]      There is no evidence as to who actually pinged Cucuta's phone.

45.)  It appears that Cucuta attributes to Lt. Betances the same Fourth Amendment violations ascribed to Capt. Radday and Lt. Ronda.  (Dkt. No. 22: 2d Am. Compl. § III.C, ¶ 5.)

### Det. Abel Joseph

Det. Joseph made the warrant application.  (Dkt. No. 72: Defs. Rule 56.1 Stmt. ¶ 46; Ex. D: Cucuta Dep. at 127; Ex. J: Warrant Application.)  Cucuta's amended complaint alleges that the warrant was secured with "sworn to falsities by Defendant Joseph approximately five hours after the illegal search and seizure."  (Dkt. No. 22: 2d Am. Compl. § III.C, ¶ 20.)

### Det. Keith Carpenter and Officer Winston Favis

Officer Favis of the Evidence Collection Team recovered from the closet the gun identified by Taylor.  (Dkt. No. 72: Defs. Rule 56.1 Stmt. ¶ 38; Ex. K: Lab Report.)  Cucuta alleges that Favis was "'inside 301 with no permission.'"  (Defs. Rule 56.1 Stmt. ¶ 48.)  Cucuta also alleges that Det. Carpenter was "at the apartment," was "on the paperwork," and that he "gave false testimony."  (Defs. Rule 56.1 Stmt. ¶ 47; Ex. D: Cucuta Dep. at 127-29.)

### ANALYSIS

## I.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Humphreys v. Cablevision Sys. Corp., No. 12-4431-cv, --- F. App'x ----, 2014 WL 185010 at *1 (2d Cir. Jan. 17, 2014); Connolly v. Calvanese, 515 F. App'x 62, 62 (2d Cir. 2013); Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 580 (2d Cir. 1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Alzawahra v. Albany Med. Ctr., 546 F. App'x 53, 54 (2d Cir. 2013); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53; Dolan v. Cassella, 543 F. App'x 90, 90 (2d Cir. 2013).

To defeat a summary judgment motion, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts.'" Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)). Instead, the non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed." Fed. R. Civ. P. 56(c)(1); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; Alzawahra v. Albany Med. Ctr., 546 F. App'x at 54; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (at summary judgment, "[t]he time has come . . . 'to put up or shut up'"), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[8]

---

[8]    See also, e.g., Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., No. 13-2921-cv, ---
F. App'x ----, 2014 WL 185012 at *2 (2d Cir. Jan. 17, 2014); Alzawahra v. Albany Med.
Ctr., 546 F. App'x at 54; Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers
(continued...)

The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248, 106 S. Ct. at 2510 (citations omitted); see also, e.g., Knight v. U.S. Fire Ins. Co., 804 F.2d at 11-12.

"The Court recognizes that it must extend extra consideration to pro se plaintiffs" and that "pro se parties are to be given special latitude on summary judgment motions."  Salahuddin v. Coughlin, 999 F. Supp. 526, 535 (S.D.N.Y. 1998) (Peck, M.J.) (citations & internal quotations omitted); see, e.g., McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (a pro se party's

---

8/      (...continued)
v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d at 1223.

pleadings should be read liberally and interpreted "'to raise the strongest arguments that they suggest'").[9]  "Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  Cole v. Artuz, 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing cases).[10]

## II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON CUCUTA'S FOURTH AMENDMENT CLAIMS

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988).  "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), cert. denied, 512 U.S. 1240, 114 S. Ct. 2749 (1994); see, e.g., Morris-Hayes v.

---

[9]    See also, e.g., Ferran v. Town of Nassau, 471 F.3d 363, 369 (2d Cir. 2006); Fuller v. Armstrong, 204 F. App'x 987, 988 (2d Cir. 2006), cert. denied, 552 U.S. 906, 128 S. Ct. 209 (2007); Gildor v. U.S. Postal Serv., 179 F. App'x 756, 758 (2d Cir. 2006); Porter v. Coughlin, 421 F.3d 141, 144 n.2 (2d Cir. 2005); Hemphill v. New York, 380 F.3d 680, 687 (2d Cir. 2004); Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003); Johnson v. Buffalo Police Dep't, 46 F. App'x 11, 12 (2d Cir. 2002), cert. denied, 539 U.S. 959, 123 S. Ct. 2645 (2003).

[10]    See also, e.g., United States v. Acomb, No. 99-6308, 216 F.3d 1073 (table), 2000 WL 899482 at *1 (2d Cir. June 29, 2000); James v. Phillips, 05 Civ. 1539, 2008 WL 1700125 at *3 (S.D.N.Y. Apr. 9, 2008); Thompson v. Tracy, 00 Civ. 8360, 2008 WL 190449 at *5 (S.D.N.Y. Jan. 17, 2008); Bunting v. Nagy, 452 F. Supp. 2d 447, 454 (S.D.N.Y. 2006); Rodriguez v. McClenning, 399 F. Supp. 2d 228, 234 & n.52 (S.D.N.Y. 2005); Pack v. Artuz, 348 F. Supp. 2d 63, 78 (S.D.N.Y. 2004); Rector v. Sylvania, 285 F. Supp. 2d 349, 353 (S.D.N.Y. 2003); Walker v. Vaughan, 216 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2002); Hussein v. The Waldorf-Astoria, 134 F. Supp. 2d 591, 596 (S.D.N.Y. 2001), aff'd, 31 F. App'x 740 (2d Cir. 2002).

Bd. of Educ. of Chester Union Free Sch. Dist., 423 F.3d 153, 159 (2d Cir. 2005); Thomas v. Roach, 165 F.3d 137, 142 (2d Cir. 1999).[11]  Additionally, where, as here, a plaintiff is seeking money damages against the defendants, the "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite'" to recovery under § 1983.  Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010) (quoting Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (Sotomayor, C.J.)).

The Court reads Cucuta's second amended complaint to allege Fourth Amendment violations from: (1) an illegal search of Taylor's apartment and (2) an illegal ping of Cucuta's cell phone.  (Dkt. No. 22: 2d Am. Compl. § III.C, ¶¶ 5, 15.)  Defendants argue that the seizure was reasonable under the Fourth Amendment because defendants had probable cause to believe Apt. 301 contained evidence of Cucuta's drug distribution conspiracy and, in any event, the officers are entitled to qualified immunity.  (Dkt. No. 73: State Br. at 10-13.)

### A.    Legal Standard Governing Fourth Amendment Search and Seizure Claims

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV (emphasis added).  As the Supreme Court repeatedly has made clear, "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 1947 (2006) (quotations omitted); see also, e.g., Fernandez v. California, 134 S. Ct. 1126, 1132 (2014); Kentucky v. King, 131 S. Ct. 1849, 1856 (2011).  That presumption, however, is not

---

11/    See also, e.g., Santiago v. Pressley, 10 Civ. 4797, 2011 WL 6748386 at *2 (S.D.N.Y. Dec. 23, 2011); Elliott v. City of N.Y., 06 Civ. 0296, 2008 WL 4178187 at *7 (S.D.N.Y. Sept. 8, 2008); Hill v. Melvin, 05 Civ. 6645, 2006 WL 1749520 at *10 (S.D.N.Y. June 27, 2006) (Peck, M.J.), aff'd, 323 F. App'x 61 (2d Cir. 2009); Ramashwar v. Espinoza, 05 Civ. 2021, 2006 WL 23481 at *6 (S.D.N.Y. Jan. 5, 2006) (Peck, M.J.), aff'd, 231 F. App'x 26 (2d Cir. 2007).

absolute.  See, e.g., Kentucky v. King, 131 S. Ct. at 1856.[12]  "The touchstone of the Fourth

Amendment is reasonableness, and the reasonableness of a search [or seizure] is determined 'by

assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the

other, the degree to which it is needed for the promotion of legitimate governmental interests.'"

United States v. Knights, 534 U.S. 112, 118-19, 122 S. Ct. 587, 592 (2001) (quoting Wyoming v.

Houghton, 526 U.S. 295, 299-300, 119 S. Ct. 1297, 1300 (1999)).[13]

### B.      The Freeze or Temporary Seizure of Apt. 301 was Reasonable

A temporary seizure supported by probable cause and exigent circumstances, namely

preventing the destruction of evidence, while the police diligently obtain a search warrant can be

reasonable under the Fourth Amendment.  See, e.g., Segura v. United States, 468 U.S. 796, 810, 104

S. Ct. 3380, 3388 (1984) (plurality opinion) ("We hold, therefore, that securing a dwelling, on the

basis of probable cause, to prevent the destruction or removal of evidence while a search warrant

is being sought is not itself an unreasonable seizure of either the dwelling or its contents.").[14]  The

Supreme Court has suggested that there is no Fourth Amendment violation where the securing of

---

[12]    Accord, e.g., United States v. Fadul, 13 Cr. 143, --- F. Supp. 2d ----, 2014 WL 1584044 at *10 (S.D.N.Y. Apr. 21, 2014); Phillips v. Cnty. of Orange, 894 F. Supp. 2d 345, 369-70 (S.D.N.Y. 2012).

[13]    Accord, e.g., In re Terrorist Bombings of U.S. Embassies in E. Africa, 552 F.3d 157, 173 (2d Cir. 2008) ("[W]arrantless searches of homes, while subject to special scrutiny, are nevertheless also subject to a balancing test—weighing an individual's expectation of privacy against the government's need for certain information—for determining reasonableness under the Fourth Amendment."), cert. denied sub nom., El-Hage v. United States, 558 U.S. 1137, 130 S. Ct. 1050 (2010).

[14]    See also, e.g., Michigan v. Summers, 452 U.S. 692, 702 n.17, 101 S. Ct. 2587, 2594 n.17 (1981) ("The fact that our holding today deals with a case in which the police had a warrant does not, of course, preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant.").

the premises is "undertaken to preserve the status quo while a search warrant is being sought." Segura v. United States, 468 U.S. at 809, 104 S. Ct. at 3387.[15]

The Supreme Court in Illinois v. McArthur, 531 U.S. 326, 121 S. Ct. 946 (2001), set forth the relevant test for determining the reasonableness of a seizure of a residence.  Under this test, courts are to "balance the privacy-related and law enforcement-related concerns" using four factors: (1) whether the police had probable cause to believe that the home contained evidence of crime or contraband; (2) whether the police had good reason to fear that, absent restraint, evidence would be destroyed before they could return with a warrant; (3) whether "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"; and (4) whether the "time period was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant."  Illinois v. McArthur, 531 U.S. at 331-33, 121 S. Ct. at 950-51 (holding that a seizure was not unreasonable where police officers, who had probable cause to believe a suspect had hidden marijuana in his home, prevented that suspect from entering his residence unaccompanied by an officer for two hours while a warrant was obtained); see also, e.g., Seifert v. Rivera, 933 F. Supp. 2d 307, 323 (D. Conn. 2013).  In this case, the McArthur factors indicate that the restraints imposed upon Apt. 301, Taylor and the other occupants of Apt. 301 while the police sought and obtained a search warrant were reasonable under the Fourth Amendment.

---

[15]  See also, e.g., Rawlings v. Kentucky, 448 U.S. 98, 109-10, 100 S. Ct. 2556, 2564 (1980) (Court did not question the admissibility of evidence discovered pursuant to a later issued warrant where officers secured, from within, the home of a person for whom they had an arrest warrant, and detained all occupants while other officers obtained a search warrant).

1.      **The Police Had Probable Cause to Believe That Apt. 301 Contained Evidence of Cucuta's Narcotics Distribution**

"'Whether probable cause existed is a question that may be resolved as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officer.'" Berg v. Sorbo, No. 12-cv-228, 2014 WL 1117643 at *4 (D. Conn. Mar. 19, 2014) (quoting Weinstock v. Wilk, 296 F. Supp. 2d 241, 246 (D. Conn. 2003)); see also, e.g., Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007) ("It has long been recognized that, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court."). Under federal law, probable cause to search exists where the totality of circumstances indicates a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983); see also, e.g., United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004), cert. denied, 544 U.S. 990, 125 S. Ct. 1878 (2005). "Probable cause is to be assessed on an objective basis." Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007). The Supreme Court has described probable cause as "a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. at 232, 103 S. Ct. at 2329. The Second Circuit has instructed lower courts to "'look to the totality of the circumstances'" and "'be aware that probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" Fabrikant v. French, 691 F.3d 193, 214 (2d Cir. 2012) (quoting Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006)); see also United States v. Feng Ling Liu, 12 Cr. 934, 2014 WL 101672 at *3 (S.D.N.Y. Jan. 10, 2014). Probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable." Walczyk v. Rio, 496 F.3d at 157.

Defendants had probable cause to secure Apt. 301 while a search warrant was sought on the belief that the apartment contained evidence of Cucuta's crimes.  Cucuta had sold crack cocaine to undercover NYPD officers in the vicinity of 1952 Second Avenue, and an arrest warrant was issued on the basis of this evidence.  (See page 2 above.)  Det. McLaughlin observed Cucuta exit 1952 Second Avenue around 11 a.m. and alerted Capt. Radday and Lt. Ronda to Cucuta's location.  (See pages 2-3 above.)  After Capt. Radday and Lt. Ronda arrested Cucuta, Cucuta told Det. Ortiz during processing that he had spent the night at 1952 Second Avenue.  (See page 3 above.)  Det. Ortiz informed Capt. Radday and Lt. Ronda that Cucuta had come from Apt. 301.  (See page 3 above.)  Indeed, based on these same facts, a neutral magistrate judge thereafter issued a search warrant for Apt. 301.  (See page 5 above; see also Ex. I: Search Warrant Application.)  Based on these facts, it is clear that Capt. Radday and Lt. Ronda had probable cause to believe that Apt. 301 contained evidence of Cucuta's drug distribution conspiracy.  See, e.g., United States v. Legette, 260 F. App'x 247, 251 (11th Cir. 2008) ("The officers had probable cause to believe that [defendant] had committed a crime and that evidence would be found in his home based on the controlled purchase of drugs and information provided by [a third party]."); United States v. Evans, No. 07-189, 2008 WL 1995132 at *1-3 (E.D. Ky. May 7, 2008) (evidence of recent drug sale sufficient to establish probable cause to search apartment of the suspected drug dealer).

### 2.    The Police Had A Reasonable Fear That Evidence Would Be Destroyed Absent the Seizure

Defendants had a reasonable belief that the tenants of Apt. 301 would destroy evidence of Cucuta's crack cocaine distribution if they were allowed to remain inside the apartment unobserved while aware of the law enforcement investigation.  Cucuta had sold crack cocaine to an undercover NYPD officer in the vicinity of 1952 Second Avenue and Cucuta admitted to Det. Ortiz

that he had spent the previous night in Apt. 301.  (See page 3 above.)  Taylor, Cucuta's girlfriend,

would have had every motivation to remove or destroy the drugs, a task made particularly easy in

this case because of the small packaging.  (See page 5 above.)  See also, e.g., Rogers v. Apicella,

606 F. Supp. 2d 272, 290 (D. Conn. 2009) ("[T]he evidence thought to be in Unit K-3—clothes,

weapons and ammunition, and proof of [defendant's] occupancy—are, unlike the marijuana at issue

in McArthur, not as easily destroyed, putting at issue whether [law enforcement] reasonably could

have feared evidence destruction if he had permitted [defendant] to enter.").  This factor weighs in

favor of finding the freeze of the apartment to be reasonable.  See, e.g., Illinois v. McArthur, 531

U.S. 326, 332, 121 S. Ct. 946, 950 (2001) ("They reasonably could have concluded that [defendant],

consequently suspecting an imminent search [of his premises], would, if given the chance, get rid

of the drugs fast."); United States v. Lamb, No. 09CR44, 2010 WL 816751 at *5 (N.D. W.Va. Mar.

5, 2010) ("Here, the seizure and subsequent measures taken by the police were reasonable. . . . At

any time, the defendant could have entered the residence and deleted th[e] evidence from his

computer. . . . Accordingly, in light of Segura and McArthur, the agents lawfully seized the

defendant's residence . . . .").[16]

---

[16]    See also, e.g., United States v. Burrell, No. 06-81, 2006 WL 1715608 at *21 (D. Minn. June
19, 2006) ("[I]t is a reasonable inference that, after being advised as to the nature of
[defendant's] charges, [the occupant of the residence] could have disposed of the contraband,
if the premises were left unsecured."); United States v. Small, No. 06CR6, 2006 WL 940326
at *4 (E.D. Va. Apr. 11, 2006) ("Therefore, here, where the evidence was relatively small
and easily removable, and [an occupant] was left inside the apartment . . . , the police were
reasonable in believing that evidence may be removed if they waited outside until a search
warrant was obtained."), aff'd, 261 F. App'x 560 (4th Cir.), cert. denied, 552 U.S. 1323, 128
S. Ct. 1901 (2008).

3.      **Neither Cucuta's Personal Liberty or Privacy Interests Nor the Length of the Restraint are Applicable**

The third and fourth <u>McArthur</u> factors require balancing the impact of the police activity on the person whose right to privacy is being infringed.  Here, however, <u>Cucuta's</u> liberty rights with respect to the apartment were never implicated.  It is undisputed that Cucuta was in police custody during the seizure and was not in the apartment.  (<u>See</u> page 5 above.)  His restraint was caused by a valid (and unchallenged) arrest warrant, supported by probable cause, for activity in which Cucuta later admitted his involvement.  (<u>See</u> page 5 above.)  The Court need not consider Taylor and Montgomery's removal from Apt. 301 and their alleged restraint in handcuffs for approximately five hours (<u>see</u> pages 4-5 above) because they are not parties to this action.[17]  The temporary seizure of Apt. 301 did nothing to infringe upon Cucuta's privacy rights.

C.      **In Any Event, the Officers are Entitled to Qualified Immunity both for the Seizure and for the Ping of Cucuta's Cell Phone**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Pearson</u> v. <u>Callahan</u>, 555 U.S. 223, 231,

---

[17]     There is no evidence that the police failed to diligently pursue obtaining the warrant.  Police arrived at 12:00 p.m. and secured a warrant around 5:00 p.m.  (<u>See</u> pages 3, 5 above.)  Under these circumstances, the five hour restraint was reasonable under the Fourth Amendment.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Christie</u>, 570 F. Supp. 2d 657, 667-69 (D.N.J. 2008) ("At bottom, this Court concludes that the agents in this case . . . acted diligently in obtaining the supplemental search warrant in as timely a manner [7 hours] as reasonably possible.  Accordingly, the restraint met the demands of the Fourth Amendment . . . ."), <u>aff'd</u>, 624 F.3d 558 (3d Cir. 2010), <u>cert. denied</u>, 131 S. Ct. 1513 (2011); <u>Briddell</u> v. <u>Chester</u>, 206 F. Supp. 2d 733, 738 (D. Md. 2002) (Plaintiff "testified that [officers] arrived at her house by 12:30 at the earliest and [another officer] testified that the warrant was signed at 6:00 p.m. at the latest, which means the seizure lasted, at most, five and a half hours.  While the seizure in <u>McArthur</u> only lasted two hours, a five-and-one-half-hour seizure seems to fit easily within the bounds of what the Supreme Court considers limited and reasonable." (fn. omitted)).

129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)).  When a government official charged with violating federal constitutional rights invokes qualified immunity to support a summary judgment motion, the Court considers, as a threshold matter, whether the facts when viewed in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right.  Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001); accord, e.g., Tolan v. Cotton, No. 13-551, --- S. Ct. ----, 2014 WL 1757856 at *4 (May 5, 2014) (per curiam).  If the answer to this question is no, "there is no necessity for further inquiries concerning qualified immunity."  Saucier v. Katz, 533 U.S. at 201, 121 S. Ct. at 2156; see also, e.g., X-Men Sec., Inc. v. Pataki, 196 F.3d 56, 66 (2d Cir. 1999) (observing that resolution of this first question favorable to defendant "moots" further inquiry into qualified immunity).  "The reason for this rule is that, where there is no viable constitutional claim, defendants have no need of an immunity shield."  Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007).[18]

        If, however, the answer to the first question is yes, the Court must decide whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Pearson v. Callahan, 555 U.S. at 232, 129 S. Ct. at 816 (citing Saucier v. Katz, 533 U.S. at 201, 121 S. Ct. at 2156).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. at 202, 121 S. Ct. at 2156; accord, e.g., Tolan v. Cotton,

---

[18]     See also, e.g., Farrell v. Burke, 449 F.3d 470, 499 n.14 (2d Cir. 2006) (Sotomayor, C.J.) ("Because we have found no cognizable violation of [plaintiff's] rights in this case, we need not reach the question of qualified immunity."); Holcomb v. Lykens, 337 F.3d 217, 223-25 (2d Cir. 2003) (declining to decide qualified immunity question and affirming summary judgment on ground that, as a matter of law, defendants did not violate plaintiff's due process rights); Muhammad v. Jenkins, 12 Civ. 8525, 2013 WL 5225573 at *8 (S.D.N.Y. Sept. 13, 2013) ("If the answer to [the first prong of Saucier] is no, the case is over—not because the defendant is entitled to qualified immunity, but because the defendant did nothing wrong.").

2014 WL 1757856 at *4.  "[T]his question is not answered by reference to how courts or lawyers might have understood the state of the law."  Walczyk v. Rio, 496 F.3d at 154.  When the right at issue is not clearly established by then existing precedent, qualified immunity shields the defendant. Pearson v. Callahan, 555 U.S. at 243-45, 129 S. Ct. at 822-23; accord, e.g., Tolan v. Cotton, 2014 WL 1757856 at *4 ("'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2511 (2002))).  "Even if the right at issue was clearly established in certain respects, however, an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context."  Walczyk v. Rio, 496 F.3d at 154 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986)).[19]  "In this respect, the Supreme Court has observed that qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Walczyk v. Rio, 496 F.3d at 154 (quoting Malley v. Briggs, 475 U.S. at 341, 106 S. Ct. at 1096.)

The Supreme Court clarified in Pearson that the rigid application of Saucier's two-step protocol is not appropriate in every qualified immunity case, but recognized that it:

> "is often beneficial," such as where the analysis of the facts under clearly established law "make[s] it apparent that . . . the relevant facts do not make out a constitutional violation at all" and where the question presented does "not frequently arise in cases in which a qualified immunity defense is unavailable."

Dean v. Blumenthal, 577 F.3d 60, 67 (2d Cir. 2009) (discussing Pearson's holding that Saucier's two-step framework is no longer mandatory), cert. denied, 559 U.S. 1058, 130 S. Ct. 2347 (2010); see

---

[19]/   See also, e.g., Betts v. Shearman, No. 13-619-cv, --- F.3d ----, 2014 WL 1717091 at *3 (2d Cir. May 2, 2014); Iqbal v. Hasty, 490 F.3d 143, 167 (2d Cir. 2007), rev'd on other grounds, 556 U.S. 662, 129 S. Ct. 1937 (2009); Cerrone v. Brown, 246 F.3d 194, 202 (2d Cir. 2001); Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995).

also, e.g., Tolan v. Cotton, 2014 WL 1757856 at *4 ("Courts have discretion to decide the order in which to engage these two prongs."); Pearson v. Callahan, 555 U.S. at 236, 129 S. Ct. at 818 (the "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

### 1.    Defendants are Qualifiedly Immune for Freezing Apt. 301

Although the Court finds that the temporary seizure of Apt. 301 did not violate Cucuta's Fourth Amendment rights, which otherwise would end the qualified immunity inquiry (see cases cited at page 18 above), defendants alternatively are entitled to the protection of qualified immunity because the law is not clearly established and their actions were objectively reasonable.

Supreme Court precedent suggests that this type of seizure to preserve the status quo can be reasonable under the Fourth Amendment, but the law in this area is not "clearly established" under the qualified immunity standard.  See, e.g., Seifert v. Rivera, 933 F. Supp. 2d 307, 329 (D. Conn. 2013) ("It is not clearly established that imposing minimal restraints upon occupants of a premises, on the basis of probable cause, to prevent them from destroying evidence while seeking a warrant is a violation of the Fourth Amendment in view of the Supreme Court's decisions in Terry, Summers, Segura, and McArthur.").  In light of the statements made in Segura and McArthur, the lack of caselaw addressing this particular factual scenario, and the fact that this Court concluded that the seizure was reasonable, an objectively reasonable officer would believe that the temporary seizure of Apt. 301 passed constitutional muster.  See, e.g., Segura v. United States, 468 U.S. 796, 809, 104 S. Ct. 3380, 3387-88 (1984) (plurality opinion) (expressing that "when officers have probable cause to believe that evidence of criminal activity is on the premises, the temporary securing of a dwelling to prevent the removal or destruction of evidence," may not violate the Fourth

Amendment, "when undertaken to preserve the status quo"); see also, e.g., Clark v. Webster, 384 F. Supp. 2d 371, 383-84 (D. Me. 2005) (qualified immunity attaches because "[i]t would be reasonable for an officer to think that McArthur authorizes officers to secure a residence from the inside . . . while waiting for a warrant").

Accordingly, defendants are entitled to qualified immunity for temporarily seizing Apt. 301.

### 2.    The Officers are Entitled to Qualified Immunity for the Ping of Cucuta's Cell Phone

Defendants also are entitled to qualified immunity for the pinging of Cucuta's cell phone because the law is not clearly established and the officers' actions were reasonable.

Whether government action constitutes a search depends upon whether "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." Smith v. Maryland, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580 (1979).  The Supreme Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." Smith v. Maryland, 442 U.S. at 743-44, 99 S. Ct. at 2582.  However, it is far from clearly established whether an individual has a legitimate and reasonable expectation of privacy in his real-time location data conveyed by his cell phone, especially where law enforcement affirmatively pings a phone to determine its location.  See, e.g., Meisler v. Chrzanowski, No. 12-cv-487, 2013 WL 5375524 at *20 (D. Nev. Sept. 24, 2013) ("After surveying the cases that have confronted this issue above, it goes without saying that the law with respect to whether a warrant based on probable cause or court order based on some lesser showing is required to obtain disclosure of prospective [cell site location

information] is not clearly established.").[20]  Few courts in this circuit have had occasion to discuss the issue.  See, e.g., United States v. Pascual, 502 F. App'x 75, 80 (2d Cir. 2012) (no plain error in district court's admission of cell site location records disclosed pursuant to a subpoena for which there was no finding of probable cause), cert. denied, 143 S. Ct. 231 (2013); United States v. Caraballo, 963 F. Supp. 2d 341, 352-61 (D. Vt. 2013) (discussing the limited caselaw regarding cell phones and privacy); In re Smartphone Geolocation Data Application, No. 13-MJ-242, --- F. Supp. 2d ----, 2013 WL 5583711 at *11-16 (E.D.N.Y. May 1, 2013) (same).  Caraballo and In re Smartphone suggest that under Smith no Fourth Amendment violation occurs when law enforcement uses cell phone location data to ascertain a person's whereabouts.  See United States v. Caraballo, 963 F. Supp. 2d at 357-60; In re Smartphone, 2013 WL 5583711 at *16.  This principle becomes more reasonable where, as here, a warrant already was issued for Cucuta's arrest.  See, e.g., In re Smartphone, 2013 WL 5583711 at *15 ("In this case, the issuance of the arrest warrant for the defendant undermines any privacy interest in prospective geolocation data. . . . The Fourth Amendment cannot accord protection to geolocation data associated with a defendant's cell phone while denying such protection against a physical invasion of his home, as the latter is entitled to the highest order of defense.").[21]

---

[20]   Cucuta admits as much in his brief, stating that although "the Second Circuit has yet to recognize a person's expectation of privacy in a person's geolocation data, they have yet to deny it."  (Dkt. No. 78: Cucuta Opp. Br. at 7.)

[21]   Indeed, the decisions in this District and the Eastern District of New York are split as to whether police need a search warrant for cell site location information. Compare In re Application of the United States for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone, 460 F. Supp. 2d 448, 461-62 (S.D.N.Y. 2006) (Gorenstein, M.J.), and In re Application of the United States of America for an Order for Disclosure of Telecommunications Records and Authorizing the Use of a Pen Register and Trap and Trace, 405 F. Supp. 2d 435, 449-50 (S.D.N.Y. 2005) (Kaplan, D.J.) (warrant not required), with In re Application of the United States of America for an Order Authorizing the Use of

(continued...)

Accordingly, defendants' are entitled to qualified immunity because an objectively reasonable officer would have believed that pinging a cell phone to determine Cucuta's location after a warrant for Cucuta's arrest was issued did not violate the Fourth Amendment.

Further, defendants would be entitled to summary judgment in any event because Cucuta has not presented any evidence as to which defendant pinged his cell phone.  See, e.g., Buffaloe v. Fein, 12 Civ. 9469, 2013 WL 5815371 at *5-7 (S.D.N.Y. Oct. 24, 2013) (Peck, M.J.); Inesti v. Hogan, 11 Civ. 2596, 2013 WL 791540 at *11-13 (S.D.N.Y. Mar. 5, 2013) (Peck, M.J.), report & rec. adopted, 2013 WL 5677046 (S.D.N.Y. Sept. 30, 2013); Smolen v. Fischer, 12 Civ. 1856, 2012 WL 5928282 at *4-6 (S.D.N.Y. Nov. 27, 2012) (Peck, M.J.), report & rec. adopted, 2013 WL 765315 (S.D.N.Y. Feb. 28, 2013).

## III.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON CUCUTA'S DUE PROCESS AND EQUAL PROTECTION CLAIMS

### A.     Cucuta Fails to State a Due Process Claim

The Due Process Clause of the Fourteenth Amendment provides that no person shall be deprived of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The Due Process Clause was intended to prevent government officials "from abusing [their] power, or employing it as an instrument of oppression."  Collins v. City of Harker Heights, Tex., 503 U.S. 115, 126, 112 S. Ct. 1061, 1069 (1992) (quotations omitted).  With respect to substantive due

---

[21/]    (...continued)
a Pen Register with Caller Identification Device Cell Site Location Authority on a Cellular Telephone, 2009 WL 159187 at *1 (S.D.N.Y. Jan. 13, 2009) (McMahon, D.J.), and In re Application of the United States for an Order for Prospective Cell Site Location Information on a Certain Cellular Telephone, 06 Crim. Misc. 01, 2006 WL 468300 at *1 (S.D.N.Y. Feb. 28, 2006) (Peck, M.J.), and In re Application of the United States for an Order (1) Authorizing the Use of a Pen Register and a Trap and Trace Device and (2) Authorizing the Release of Subscriber Information and/or Cell Site Information, 396 F. Supp. 2d 294, 323-24 (E.D.N.Y. 2005) (Orenstein, M.J.) (warrant is required).

process, the Supreme Court has repeatedly held, that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'"  Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 813 (1994) (plurality opinion) (quoting Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989)).

Because Cucuta's claims sound in a search and seizure violation under the Fourth Amendment, it is the Fourth Amendment that provides the proper analytical framework.  See, e.g., Graham v. Connor, 490 US. at 395, 109 S. Ct. at 1871 ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."); Bryant v. City of N.Y., 404 F.3d 128, 136 (2d Cir. 2005) ("'Substantive due process analysis is . . . inappropriate . . . [where a] claim is "covered by" the Fourth Amendment.'" (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 843, 118 S. Ct. 1708, 1715 (1998))); Marchand v. Simonson, No. 11-cv-348, --- F. Supp. 2d ----, 2014 WL 1672022 at *17 (D. Conn. Apr. 28, 2014) ("As the Fourth Amendment provides an explicit textual source of protection for 'pretrial deprivations of liberty, . . . it is the proper guide for analyzing plaintiff's constitutional claims, not the Fourteenth Amendment.' The Court will therefore grant defendants' [summary judgment] Motion on plaintiff's Fourteenth Amendment Substantive Due Process claim." (citation omitted)); Kastle v. Town of Kent, N.Y., 13 Civ. 2256, 2014 WL 1508703 *9-10 (S.D.N.Y. Mar. 21, 2014) ("[P]laintiffs' claims are largely premised on alleged conduct proscribed by the Fourth Amendment.  The Court concludes plaintiffs' claims are therefore substantially 'covered' by the Fourth Amendment . . . and declines to expand the concept of

substantive due process to encompass such conduct. . . . Accordingly, plaintiffs' substantive due process claim is dismissed.").

Accordingly, having already analyzed Cucuta's Fourth Amendment claims and found for defendants, defendants' summary judgment motion as to Cucuta's due process claim similarly is <u>GRANTED</u>.[22]

### B.   <u>Cucuta Fails to State an Equal Protection Claim</u>

Cucuta asserts that his equal protection claim is not based on selective enforcement, but rather on the premise that the NYPD's conduct was not "rationally related to the accomplishment of the work of their agency."  (<u>See</u> Dkt. No. 78: Cucuta Opp. Br. at 9 (citing <u>Vill. of Willowbrook</u> v. <u>Olech</u>, 528 U.S. 562, 120 S. Ct. 1073 (2000) (per curiam).)  Under either standard, however, Cucuta's claim fails because he has neither alleged any facts nor provided any evidence to show that he was treated differently from others similarly situated, nor that a search of an apartment he had stayed at is not related to the gathering of evidence, the "work" of the police department.

Accordingly, defendants' summary judgment motion as to Cucuta's equal protection claim is <u>GRANTED</u>.

## IV.   DEFENDANT NEW YORK CITY IS ENTITLED TO SUMMARY JUDGMENT ON CUCUTA'S MONELL CLAIM

Cucuta's <u>Monell</u> claim is based on the City's alleged "policy, custom, and practice" to illegally search and seize premises during "a case takedown."  (Dkt. No. 22: 2d Am. Compl. § III.C, ¶ 18; <u>see</u> Dkt. No. 73: Defs. Br. at 26.)  Defendants argue that Cucuta fails to allege the existence of a municipal policy that resulted in a constitutional violation.  (Defs. Br. at 25-26.)

---

[22]/   Cucuta asserts that a substantive due process claim is viable if the police conduct is "'so egregious and so outrageous that it shocks the conscience.'"  (Dkt. No. 78: Cucuta Opp. Br. at 7.)  The police conduct here (<u>see</u> pages 2-5 above) does not "shock the conscience."

A.      **Standards Governing Monell Claims**

It is well established that a municipality may not be held liable under Section 1983 for alleged unconstitutional actions by its employees below the policy-making level solely upon the basis of respondeat superior.  E.g., Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978); Patterson v. Cnty. of Oneida, 375 F.3d 206, 226 (2d Cir. 2004); DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998); Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995); Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 122 (2d Cir. 1991).  Rather, in order to hold a municipality liable under § 1983 for the unconstitutional acts of its employees, the plaintiff must plead and prove that the violation of constitutional rights resulted from a municipal custom or policy.  See, e.g., Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011); Pembaur v. City of Cincinnati, 475 U.S. 469, 478-83, 106 S. Ct. 1292, 1297-300 (1986); Costello v. City of Burlington, 632 F.3d 41, 49 (2d Cir. 2011); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).  The plaintiff need not identify an explicit, official policy or practice.  See, e.g., Patterson v. Cnty. of Oneida, 375 F.3d at 226; Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 870 (2d Cir. 1992). It is sufficient to show a widespread pattern of behavior that constitute a "custom or usage with the force of law" or "the constructive acquiescence of senior policy-making officials."  Patterson v. Cnty. of Oneida, 375 F.3d at 226 (quotations omitted); see, e.g., Connick v. Thompson, 131 S. Ct. at 1359 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."); Belpasso v. City of N.Y., 07 Civ. 3627, 2008 WL 2676579 at *5 (S.D.N.Y. July 2, 2008); Gorton v. Gettel, 04 Civ. 0236, 2007 WL 2154193 at *9 (S.D.N.Y. June 22, 2007), aff'd, 554 F.3d 60 (2d Cir. 2009).  "A policy, custom, or practice may also be inferred where 'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of

those within its jurisdiction.'" Patterson v. Cnty. of Oneida, 375 F.3d at 226; see, e.g., Connick v. Thompson, 131 S. Ct. at 1359.  Any analysis of an allegation of municipal liability under § 1983 begins with "the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 1203 (1989).

### B.    Application to Cucuta's Monell Claim

Cucuta alleges that New York City has a "policy, custom, and practice . . . for the above named defendants as part of their tactical plans when they go over a case takedown if a premises is secured of subjects to speak to defendant [A.U.S.A.] Poscablo[23] to search for firearms and contraband evidence." (Dkt. No. 22: 2d Am. Compl. § III.C, ¶ 18; see also Dkt. No. 78: Cucuta Opp. Br. at 9.)  However, Cucuta has not presented any evidence from which to infer the existence of such municipal policies or practices.  Cucuta's brief conclusorily asserts that "if discriminatory practices of City officials are persistent and wide spread, they could be so permanent and well settled as to constitute a custom or usage with the force of law and thereby generate municipal liability (Cucuta Opp. Br. at 9), but Cucuta fails to show what the practices are or that they are so persistent and wide spread.  Cucuta's claim is nothing more than a rehashing of the events of April 13, 2011 couched as a policy with no supporting evidence.  This showing is insufficient.  (See cases cited at page 8 above.)

Moreover, and most importantly, the Court's determination that Cucuta has not proven a constitutional violation (see Part II above) is fatal to his Monell claim, because the existence of a municipal policy only would be actionable if it were causally connected to a

---

[23]/    All claims against Poscablo previously were dismissed on immunity grounds.  (Dkt. No. 13: 8/7/13 Order at 2.)

constitutional violation.  See, e.g., O'Leary v. City of N.Y., 938 F. Supp. 2d 410, 417 (E.D.N.Y. 2013) ("To state a claim for municipal liability under Monell, a plaintiff must show (1) a violation of his constitutional rights, and (2) that the violation was caused by a municipal policy or custom. Because this Court has already concluded that Plaintiff has not suffered any violation of his constitutional rights, his Monell claim must be dismissed." (citations omitted)); see also cases cited at pages 26-27 above.

Accordingly, because Cucuta has not shown evidence of any City policy or practice, defendants' summary judgment motion as to Cucuta's Monell claim is GRANTED.

## CONCLUSION

For the reasons set forth above, defendants' summary judgment motion (Dkt. No. 70) is GRANTED.  The Clerk of Court shall close the case.

SO ORDERED.

Dated:      New York, New York
            May 9, 2014

**Andrew J. Peck**
United States Magistrate Judge

Copies to:    Abraham Cucuta (Mail)
              All Counsel (ECF)